840 A.2d 220

MONTGOMERY COUNTY BOARD OF EDUCATION

v.

HORACE MANN INSURANCE COMPANY.

No. 285, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Dec. 30, 2003.

Sharon V. Burrell (Charles W. Thompson, Jr., County Attorney, Joann Robertson, Chief Counsel Litigation Division, on the brief), Rockville, for Appellant.

Charles E. Wilson, Jr., (Amy Leete Leone, on the brief), Rockville, for Appellee.

Panel DAVIS, GREENE and SHARER, JJ.

DAVIS, J.

On February 13, 1998, John Doe filed a Complaint in the United States District Court against, *inter alia,* appellant Montgomery County Board of Education and Ms. Barbara Robbins. The Complaint alleged that Ms. Robbins, as a teacher and mentor employed by appellant in the late 1980's, had negligently and intentionally inflicted emotional distress upon and violated the constitutional civil rights of John Doe, a former student and mentee. These claims were grounded in allegations of a sexual relationship between Ms. Robbins and John Doe while he was a minor. Appellee Horace Mann Insurance Company represented Ms. Robbins throughout the litigation because appellant had previously denied Ms. Robbins's request to provide representation and indemnification. The case was ultimately settled in August 2000.

On June 12, 2001, appellee filed a Complaint for Declaratory Relief against appellant. Appellee requested that the circuit court declare that appellant was required to defend and indemnify Ms. Robbins in the federal suit and order appellant to pay the legal expenses incurred by appellee for its representation in the suit and subsequent settlement. After appellant and appellee filed respective motions for summary judgment, the trial judge (Harrington, J.) conducted a hearing to consider the motions on November 26, 2002. The trial judge issued an Opinion and Order on January 16, 2003, granting appellee's Motion for Summary Judgment, finding that appellant was required to provide a defense and indemnification for Ms. Robbins in the federal lawsuit. After a hearing to consider damages, the trial judge entered judgment in favor of appellee in the amount of $100,556.52 for the legal costs associated with appellee's representation of Ms. Robbins. On April 17, 2003, appellant timely noted its appeal.

Appellant presents three questions for our review, which we combine into one question and rephrase as follows:

Did the trial court err in granting summary judgment in favor of appellee?

We answer the question in the negative and, thereby, affirm the judgment of the circuit court.

## FACTUAL BACKGROUND

In 1989, Earle B. Wood Middle School (Wood Middle School), located in Rockville, Montgomery County, developed and implemented the Mentor Program (Program). The goal of the Program was "to assist youngsters from a diverse ethnic and socio-economic background with academic support and [ ] help [ ] improve communication patterns within the school population and with the home and community." Through the Program, a teacher, administrator, or staffer would be paired with a student attending Wood Middle School, who would become the mentee. While any student of Wood Middle School was eligible to become a mentee, the Program generally sought "at-risk" students with academic or behavioral problems. Each mentor was charged with providing a more "humanistic" interaction with his or her protege to ultimately foster the protege's "own individuality and self-concept." In practical terms, a mentor not only assisted the protege in academic affairs but attempted to establish a relationship of trust and support in order to increase a mentee's self-esteem.

In late 1989, Barbara Robbins, a teacher at Wood Middle School who was over forty years of age, was assigned through the Program to be a mentor to John Doe, a twelve-year-old student in the sixth grade. Their mentor/mentee relationship lasted throughout John Doe's matriculation to Wood Middle School until 1991 when John Doe finished the eighth grade.

In 1996, John Doe was convicted of armed robbery and possession of controlled dangerous substances. Before his period of incarceration began, a social worker interviewed him for the purposes of an evaluation. During the interview, John Doe claimed that, between the ages of twelve and sixteen,

when he attended Wood Middle School and continuing into high school, he was sexually abused by Ms. Robbins. The social worker forwarded John Doe's allegations to the Montgomery County Police Department (MCPD) who, in turn, relayed the information to appellant. While the MCPD investigated the allegations, appellant, by correspondence dated November 22, 1996, informed Ms. Robbins that she was being reassigned from her teaching duties to a non-school-based role in the Montgomery County Public School System because of John Doe's claims. Appellant then initiated its own investigation into the allegations of an inappropriate sexual relationship between John Doe and Ms. Robbins.

In November 1996, Dr. Elizabeth L. Arons, the Director of the Department of Personnel Services, conducted two meetings with Ms. Robbins. Throughout the meetings, Ms. Robbins consistently denied that a sexual relationship existed between her and John Doe. On February 21, 1997, Stan Schaub, the Director of the Division of Staffing, issued a memorandum to Dr. Arons regarding the investigation of Ms. Robbins. Attached to the memorandum were various transcripts of interviews from individuals ranging from John Doe to his friends and acquaintances, along with principals and secretaries of Wood Middle School at the time the alleged events occurred. The transcripts reflected that John Doe had made statements concerning the sexual nature of his relationship with Ms. Robbins and that certain staff members of Wood Middle School personally observed unusual interactions between the two. Mr. Schaub also obtained several letters and other correspondence that John Doe had received from Ms. Robbins that were allegedly "love letters" exchanged while he was in the Program.

By letter dated December 12, 1997, counsel for Ms. Robbins formally requested that appellant "undertake to represent and defend the interests of [his] client . . . in matters pertaining to the pending claim of John Doe." The letter further stated that Ms. Robbins had "vigorously denied" the claims set forth in the "draft [c]omplaint." On February 13, 1998, John Doe filed a Complaint in the United States District Court for the

District of Maryland against appellant, Montgomery County (County), the principal of the Wood Middle School at the time of the alleged events, and Ms. Robbins. In the Complaint, which consisted of five counts, John Doe asserted claims for alleged violations of his constitutional civil rights, sexual abuse of a minor, and for negligent and intentional infliction of emotional distress. By letter dated February 27, 1998, appellant, through county attorney Charles W. Thompson, Jr., declined to provide Ms. Robbins with a defense and indemnification for the civil suit filed by John Doe. Through an Educators Employment Liability Policy issued by appellee to the Maryland State Teachers Association, of which Ms. Robbins was a member, appellee provided representation to Ms. Robbins in the case before the U.S. District Court.

By orders dated March 2, 1999 and May 12, 2000, the U.S. District Court judge dismissed or granted summary judgment in favor of all of the defendants, except for Ms. Robbins. In August 2000, the parties settled the case. Pursuant to the settlement agreement, appellee paid John Doe $15,000 in exchange for a dismissal of all of the claims against Mrs. Robbins.

On June 12, 2001, appellee filed a Complaint for Declaratory Relief in the Circuit Court for Montgomery County against appellant. Appellee requested that the circuit court declare that appellant had a duty to defend and indemnify Ms. Robbins in the U.S. District Court case, that appellant's duty was primary to appellee's duty to defend, and that appellant breached that duty. Based on these declarations, appellee ultimately sought an order requiring appellant to reimburse appellee for the costs of representation and payment of the settlement.

Appellee filed a Motion for Summary Judgment on September 25, 2002, to which appellant responded on October 25, 2002. Appellant additionally filed its own Motion for Summary Judgment on September 27, 2002. Appellee filed an Opposition to that motion on October 16, 2002 and, on November 26, 2002, the open motions came before the trial judge for

a hearing. After considering the motions, exhibits attached thereto, and the arguments of counsel, the trial judge issued an Opinion and Order on January 16, 2003. The trial judge found that there was no genuine dispute as to a material fact that some of Ms. Robbins's actions alleged in the Complaint were within the scope of her duties. As a result, the trial judge granted appellee's Motion for Summary Judgment, declared that appellant had a duty to defend or indemnify Ms. Robbins, and ordered appellant to reimburse appellee for legal expenses associated with defending and settling the claims against Ms. Robbins. In ruling against appellant, the trial judge opined:

This declaratory judgment action is appropriate for summary judgment and can be decided as a matter of law. The material facts are not in dispute. The issue for the [c]ourt to determine is whether those portions of the allegations of the complaint that are potentially within [Ms. Robbins's] authorized official capacity as a mentor created a duty on the part of [appellant] to provide her with a defense.

The complaint alleges actions by [Ms. Robbins] in her role as a mentor that are potentially within the scope of her employment as a teacher, within the range of duties of someone in the [Program], undertaken without malice and performed while she was acting within her authorized official capacity. The extrinsic evidence supports this.

John Doe incorporates into each count of the complaint his allegations of the ways in which [Ms. Robbins] abused her special relationship with him (even the actions that are arguably appropriate for a mentor such as calling him and providing transportation). For those acts he seeks economic, non-economic and punitive damages. Rather than consider those allegations independently, [appellant] focused its attention on the sexual abuse allegations, determined they were inextricably linked to each count of the [C]omplaint, and declined coverage.

[Appellant's] analysis ignores the potential dynamics of the process of a civil case, wherein theories of liability are added or deleted as the case develops. Even if all allega-

tions of sexual abuse stated in the complaint are disregarded, a cause of action remains for economic and non-economic damages resulting from [Ms. Robbins's] alleged misuse of her position as a teacher/mentor. The potential exists that judgment in the tort suit could have been entered against [Ms. Robbins] for alleged improper conduct separate and apart from any sexual abuse. For that reason, the [c]ourt is persuaded that [appellant] had a duty to defend part of the suit. Consequently, [appellant] had a duty to defend the lawsuit in its entirety.

On March 17, 2003, after a hearing on damages, appellant was ordered to pay appellee $100,556.52 plus court costs. This appeal followed.

## LEGAL ANALYSIS

Appellant contends that the trial court erred in granting summary judgment in favor of appellee because, pursuant to its Self–Insurance Agreement (Agreement), it was not required to defend Ms. Robbins against allegations that were not within the scope of her duties. Appellee counters that the trial judge was legally correct when she determined that the allegations in the Complaint had the potential to come within the scope of Ms. Robbins's employment and, thus, appellant was required to defend and indemnify Ms. Robbins in the federal lawsuit.

Pursuant to Maryland Rule 2–501, a trial judge may grant summary judgment only if "there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Here, there are no genuine disputes as to any material facts because the sole question in this appeal involves a legal interpretation of relevant statutes, the various insurance agreements between the parties, and the Complaint. On this appeal, we are not required to give any deference to the trial judge's conclusions of law. *East v. PaineWebber, Inc.*, 131 Md.App. 302, 308, 748 A.2d 1082 (2000)(quoting *Lopata v. Miller*, 122 Md. App. 76, 83, 712 A.2d 24 (1998)). Ultimately, we will review

the trial court's grant of summary judgment to determine "whether the trial court was 'legally correct.'" *Cooper v. Berkshire Life Ins. Co.*, 148 Md.App. 41, 56, 810 A.2d 1045 (2002).

. To determine whether Ms. Robbins was entitled to coverage under the Montgomery County Self–Insurance Program (MCSIP), we will engage in a two-part inquiry. First, we must ask, "[W]hat is the coverage and what are the defenses under the terms and requirements of the insurance policy?" *St. Paul Fire & Ins. Co. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282 (1981). Second, we review whether "the allegations in the tort action potentially bring the tort claim within the policy's coverage." *Id.* In *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407–08, 347 A.2d 842 (1975), the Court of Appeals set forth the basis for the potentiality rule:

> The obligation of an insurer to defend its insured under a contract provision such as here involved is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. ... Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.

In the factual scenario before us, there is no insurance contract but there is the Agreement that is derived from §§ 4–104 and 4–105 of the Education Article, which provide the framework for comprehensive liability insurance and self-insurance. While *Brohawn's* analysis applies to the instant matter, the issue of "potentiality must be drawn from the terms of the self[-]insurance authorized by the statute." *Matta v. Bd. of Educ. of Prince George's County*, 78 Md.App. 264, 269, 552 A.2d 1340 (1989).

The analytical framework enunciated in *Pryseski* and *Brohawn* is still valid today subject to one further modification created by the Court of Appeals in *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 651 A.2d 859 (1995). Prior to that decision, Maryland courts reviewed insurance policies and

pleadings utilizing the "exclusive pleading rule." *See Nation-wide Ins. Cos. v. Rhodes,* 127 Md.App. 231, 241, 732 A.2d 388 (1999). Simply stated, the rule, also known as the "eight corners rule," required a reviewing court to analyze only the complaint and the insurance policy when determining whether a claim could potentially come within the coverage and, consequently, disregard any extrinsic evidence. *See id.*

In *Cochran,* however, the Court of Appeals pointed out that, while *Brohawn* prohibited the use of extrinsic evidence for the benefit of the *insurer* to contest the potentiality of coverage, there was no language preventing an *insured* from utilizing extrinsic evidence to demonstrate the potential for coverage under the insurance policy. *Cochran,* 337 Md. 98, 107–08, 651 A.2d 859 (1995). Thus, the Court held that, when a complaint fails to assert tort allegations that are sufficient to establish potentiality of coverage, an insured is permitted to introduce extrinsic evidence that attempts to bring the action within the ambit of coverage under the insurance policy. *Id.* at 107–08, 112, 651 A.2d 859. The expansion of the original inquiry to include extrinsic evidence, if necessary, serves to protect an insured from a factually-deficient complaint filed by a disinterested third party and allows a greater opportunity for an insured to obtain representation from the insurer, which is part of the bargained-for exchange in any insurance policy. *Id.* at 110, 651 A.2d 859.

Consequently, the second part of our inquiry will focus on an evaluation of "the causes of action actually alleged by the plaintiff in [the] lawsuit, along with relevant extrinsic evidence." *Reames v. State Farm Fire and Cas. Ins.,* 111 Md.App. 546, 560–61, 683 A.2d 179 (1996). The extrinsic evidence, however, must be relevant to the causes of action pled in the complaint. *Id.* at 561, 683 A.2d 179. "[A]n insured cannot assert a frivolous defense merely to establish a duty to defend on the part of [her] insurer." *Cochran,* 337 Md. at 111–12, 651 A.2d 859. When offering extrinsic evidence, the insured is required to show "that there is a reasonable potential that the issue triggering coverage will be generated at

trial." *Id; see also Reames,* 111 Md.App. at 561, 683 A.2d 179 (stating that "causes of action that could potentially have been supported by the factual allegations or the extrinsic evidence" but are otherwise not asserted in the complaint are prohibited from forming the basis of an insurer's duty to defend). Any uncertainty regarding the potentiality of coverage based on the allegations of a complaint must be resolved in favor of the insured. *Cochran,* 337 Md. at 107, 651 A.2d 859. Ultimately, if any claim could potentially be covered by the statutes and the Agreement, appellant is required to defend all of the claims asserted. *Zurich Ins. Co. v. Principal Mut. Ins. Co.,* 134 Md.App. 643, 649–50, 761 A.2d 344 (2000)(quoting *Utica Mut. Ins. Co. v. Miller,* 130 Md.App. 373, 383, 746 A.2d 935 (2000)).

■ We begin the first part of our inquiry by reviewing the applicable statutes and insurance agreements between the parties. A county board of education is a corporate entity that "may sue or be sued" but, nonetheless, enjoys immunity from liability in tort actions. Md.Code (2001 Repl. Vol), Educ., § 3–104(b)(2); *Board of Educ. v. Alcrymat Corp. of Am.,* 258 Md. 508, 512, 266 A.2d 349 (1970). However, teachers and other county board of education employees are subject to tort liability. *See generally Segerman v. Jones,* 256 Md. 109, 123–25, 259 A.2d 794 (1969). As a result, the General Assembly requires that a county board of education "carry comprehensive liability insurance to protect the board and its agents and employees." Educ. § 4–105(a). The County has enacted regulations pertaining to comprehensive liability coverage for all of its various agencies, which includes appellant, in the Montgomery County Code (MCC). Specifically, § 20–37 of the MCC provides that

[t]he county is . . . authorized and empowered to provide for an adequate comprehensive insurance program to compensate for injury or death of persons . . . deprivation of civil rights, malpractice or any other type of civil or tortious action resulting from the negligence or wrongful act of any

public official, agent or employee within the scope of official duties.

MCC § 20–37(c).

The MCC further states that

[t]he insurance program shall provide for defense of claims as well as compensation for damages and the county is authorized within the limits of appropriations of the funded insurance program ... to provide a defense with attorneys to be selected as provided in the charter, and to settle claims and pay lawful judgments.

*Id.*

The County is additionally "authorized to cooperate with and enter into agreements with participating agencies, including ... [appellant] ... for the purpose of obtaining and providing comprehensive insurance coverage in the most economical manner." MCC § 20–37(d). The MCC also empowered the County to establish the MCSIP. *See* MCC § 20–37(e). The amount of coverage for the MCSIP is required to be no less than that of the comprehensive liability insurance and "shall conform with the terms and conditions" of the comprehensive liability coverage independently available to the County. *See* Educ. § 4–105(c)(3)(ii); MCC § 20–37(e)(3). Appellant obtained coverage under the MCSIP through the Agreement executed with the County on June 30, 1978. Under the MCSIP, appellant receives coverage for "comprehensive general liability ... public officials legal liability" and "professional liability" claims. Agreement at p. 1; Amendment to Agreement (February 1, 1979) at p. 1. Whenever a question of coverage exists, the County Attorney is authorized to investigate whether an employee is eligible for coverage. If the County Attorney determines that a denial of coverage is warranted, that recommendation is made to the Interagency Insurance Panel (IIP), which consists of representatives of County agencies participating in the MCSIP. *See* Self–Insurance Program Procedures at p. 6. After considering a recommendation, the IIP then meets to "determine those issues of

coverage, defense and indemnification by the majority vote of a quorum of all of its members."

After reviewing the MCC, the Agreement, and the Self–Insurance Program Procedures, it is clear that coverage under the MCSIP is extended only to employees acting "within the scope of [their] official duties" and in the absence of malicious or wilful intent. Stated another way, the Self–Insurance Program Procedures excludes from coverage "[c]laims arising from: 1.[a]ctions falling outside the scope of employment; 2.[c]ases of wanton or malicious wrongdoing; [and] 3.[i]ntentional torts," among others.

Additionally, a county board is required to provide a defense for any county board employee against whom a claim or suit is filed. Educ. § 4–104(d). This requirement, however, is contingent upon the satisfaction of two statutorily mandated factors. First, the action that is the subject of the claim or suit must have been "taken in the performance of [the county board employee's] duties, within the scope of [her] employment, and without malice." Educ. § 4–104(d)(i). Finally, the county board must "determine[ ] that [the county board employee] was acting within [her] authorized official capacity in the incident." Educ. § 4–104(d)(ii). Thus, in order to be entitled to a defense to a claim, an employee is required to satisfy the aforementioned two factors.

We now turn to the second part of our inquiry and evaluate the causes of action actually alleged in the Complaint. In a section of the Complaint entitled, "Preliminary Statement and Summary of Action," John Doe alleged that Ms. Robbins "intentionally inflicted emotional distress upon him" and "abused her special relationship" with him. John Doe then set forth eight specific factual allegations to support his claim: "[Ms. Robbins]: a. called [John Doe]; b. bought him gifts; c. sent food to his home; d. invited him into the bedrooms and other rooms of her home; e. sent him love cards; f. wrote him love letters; g. provided him with transportation; h. and frequently had vaginal and other forms of sex with him." Allegations "a" through "g" describe facially non-sexual con-

duct. On the other hand, the factual allegation in "h" describing the sexual relations between Ms. Robbins and John Doe is, obviously, sexual in nature.

While there exists a combination of non-sexual and sexual conduct alleged in the "Preliminary Statement" section of the Complaint, a plain reading of the actual counts of the Complaint shows that the actual causes of action rely solely on the alleged sexual relations between Ms. Robbins and John Doe to form a basis for relief. In Count I, which claims that John Doe's constitutional civil rights were violated, John Doe stated that he had "a liberty interest in his bodily integrity which was violated when a school employee wilfully, intentionally and repeatedly had sex with him." In John Doe's Title IX claim in Count II, he asserts that "[Ms.] Robbins'[s] sexual abuse of [John] Doe discriminated against [John] Doe on the basis of gender in the school's educational programs and activities." Count III's negligence claims state that Ms. Robbins breached her duty "to conduct herself in a professional manner . . . by engaging in an extended abusive sexual relationship with [John Doe] . . . knowing he was under the age of consent."

John Doe brings a claim against the principal of Wood Middle School and appellant in Count IV, alleging that they had a duty "to prevent [Ms. Robbins] from sexually abusing [John] Doe so that she would not cause him injury and emotional distress." Finally, Count V states a claim for Intentional Infliction of Emotional Distress alleging that Ms. Robbins acted with "malice and evil intent aforethought" when she breached her professional duty by "engaging in an extended sexual relationship with [John] Doe . . . knowing he was under the age of consent."

It is patently clear that, out of all of the factual allegations contained in the "Preliminary Statement," the only fact expressly relied upon in every count that embodied a cause of action was the extended sexual relationship between Ms. Robbins and John Doe. To be sure, the prior factual allegations, including the facts alleged in the "Preliminary Statement" were incorporated into each count. But, the gravamen

of the causes of action actually alleged was the sexual relations between Ms. Robbins and her minor student, John Doe. For this reason, we disagree with the trial court's determination that the Complaint states a cause of action for the alleged non-sexual conduct.

■ The trial court's reliance on the fact that "theories of liability are added or deleted as the case develops," is misplaced because a review of a complaint to determine potentiality of coverage is limited to "causes of action actually alleged by the plaintiff." *Reames*, 111 Md.App. at 560–61, 683 A.2d 179. Unasserted causes of action that may or may not be added to a complaint are not proper for a reviewing court's consideration. *Id.* A reading of the plain language of the Complaint shows that there are no causes of action actually alleged for damages resulting from Ms. Robbins's non-sexual conduct. While counts encompassing the non-sexual conduct and the alleged damages resulting therefrom could have been properly set forth in the Complaint, no such causes of action were actually asserted. Moreover, the trial court's finding that judgment could have been entered against Ms. Robbins even if allegations regarding the sexual abuse of John Doe were disregarded is also legally incorrect. This conclusion ignores the plain language of the Complaint that repeatedly contends that Ms. Robbins breached her professional duty solely by engaging in sexual relations with her minor student. As stated above, no claims exist actually asserting that Ms. Robbins breached her professional duty to John Doe by calling him, buying him gifts, etc. Thus, if John Doe ultimately failed to prove that a sexual relationship existed, then judgment could not be entered against Ms. Robbins on any count.

■ Because sexual abuse is the factual foundation of John Doe's claims, we shall address whether those factual allegations demonstrate a potentiality of coverage. The Court of Appeals has stated that "[c]hild sexual abuse is an affront to the dignity of the child." *Pettit v. Erie Ins. Exchange*, 349 Md. 777, 783, 709 A.2d 1287 (1998). Additionally, "sexual

activity between an adult and a minor child [is] ... injurious *per se* " and is a tort that is "only committed intentionally" by the adult. *Id.* at 781–82, 786, 709 A.2d 1287. Assuming the truth of John Doe's allegations, we cannot envision how any sexual relationship between a teacher/mentor and a minor student/mentee would be potentially within the scope of employment and not be malicious, wanton, or intentional. Additionally, we have previously determined that it is not "even potentially possible for any court or reasonable jury to conclude that teachers are 'authorized' to sexually abuse or harass their students." *Matta,* 78 Md.App. at 274, 552 A.2d 1340. As a result, we hold that the gravamen of the Complaint alleging sexual abuse by Ms. Robbins of John Doe is outside of the coverage of the Agreement and is not potentially within coverage, as well. Therefore, the trial court's conclusion that the Complaint states allegations that are potentially covered by the Agreement is legally incorrect.

We now review the relevant extrinsic evidence to establish whether there is a potentiality of coverage. Because we have previously determined that the only causes of action actually asserted in the Complaint were based on the alleged sexual relationship, we shall review only extrinsic evidence that is relevant to those claims. At the outset, we note that there is no extrinsic evidence that conclusively affirms or denies the existence of a sexual relationship between Ms. Robbins and John Doe. Essentially, the extrinsic evidence relevant to the alleged sexual conduct consists principally of John Doe's statements and Ms. Robbins's repeated denials. Ms. Robbins has never admitted that a sexual relationship existed between her and John Doe and, instead, has consistently denied the existence of a sexual relationship during interviews with Dr. Arons and the detective leading the criminal investigation for the MCPD. Furthermore, there was evidence that several of Ms. Robbins's superiors were unaware of any type of inappropriate relationship with John Doe and, otherwise, felt that she was a dedicated and hard-working teacher. After reviewing the "love" letters, the testimony of Wood Middle School staff members, John Doe's family members and friends and others,

we are persuaded that the extrinsic evidence is inconclusive as to the existence of a sexual relationship between Ms. Robbins and John Doe.

■ Viewing the relevant extrinsic evidence in a light most favorable to Ms. Robbins, her consistent denial of any sexual involvement with the minor student creates an inference that her relationship with John Doe was never anything more than a professional relationship. *A fortiori* her conduct and the relationship with John Doe was potentially within the scope of employment, authorized in her official capacity, and not malicious or intentional. As a result, appellee has sufficiently demonstrated through extrinsic evidence that Ms. Robbins's actions were potentially covered under the Agreement. Therefore, the trial court's finding, which was consistent with our analysis, was legally correct. We, accordingly, affirm that portion of the trial court's opinion. While we have previously concluded that the trial court was legally incorrect on two grounds, we hold that the proof that Ms. Robbins's conduct was within the scope of her employment on this basis is sufficient to support the ultimate grant of summary judgment in appellee's favor. Accordingly, the ultimate conclusion that appellant had a duty to defend and indemnify the lawsuit against Ms. Robbins was legally correct.

Appellee raises a secondary argument that we address briefly. Appellee claims that appellant and the IIP failed to follow their mandated procedures when both entities rendered their denial of coverage to Ms. Robbins without a meeting and a vote. We note that appellee raised the issue in the lower court but the trial judge, in her opinion and order, never addressed the issue and granted summary judgment on other grounds, upon which we based our review on this appeal. Whenever we consider the grant of summary judgment on appeal, we are ordinarily confined to the basis of the trial court's judgment and cannot support its conclusion with "new legal theories." *Warner v. German*, 100 Md.App. 512, 517, 642 A.2d 239 (1994). However, Maryland Rule 8–131 allows us to consider a matter not addressed in the lower court if it

would aid the trial court on remand or prevent another appeal. Because we have already ruled on the merits and we are not requiring the trial court to remand this matter to the IIP for further proceedings, we need not address this issue and it is otherwise moot.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**